**Connie RANGE, Trustee of the Martha Range Trust d/b/a Reliant Engineering and Machine, US, and Samuel Range, Appellants**

v.

## CALVARY CHRISTIAN FELLOWSHIP,
### Appellee

### NO. 14-15-00672-CV

Court of Appeals of Texas, Houston (14th Dist.).

Opinion filed October 3, 2017

Rehearing and Rehearing En Banc Denied November 14, 2017

---

Sherwin Faridifar, Thomas R. Phillips, Austin, TX, for Appellants.

Misty Gasiorowski, Tanya Nicole Garrison, Houston, TX, for Appellee.

Panel consists of Justices Christopher, Jamison, and Donovan.

## OPINION ON REHEARING

Tracy Christopher, Justice

In this dispute between a commercial tenant and its landlord, both sides appeal from the judgment rendered after a jury trial. The tenant and a related party maintain that the landlord breached an agreement to sell the property to one or both of them and additionally breached a lease provision giving the tenant the right to lease additional space. The tenant and the related party sued the landlord for breach of contract, common-law fraud, statutory fraud, and promissory estoppel, prevailing only on the promissory-estoppel claim. The landlord unsuccessfully counterclaimed for breach of the lease, but received some of the declaratory relief it sought. The trial court refused each side's requests for a contractual award of attorneys' fees.

On appeal, the tenant and the related party contend the evidence conclusively establishes that the landlord breached the agreement to sell the property and that they are entitled to specific performance, or in the alternative, an award of damages. The tenant similarly contends that the evidence conclusively establishes that the landlord breached an agreement to lease additional space, and seeks rendition of judgment for those damages as well. The tenant and related party further argue that the trial court abused its discretion in denying their motion to disqualify the landlord's law firm.

The landlord also appeals the judgment, arguing *inter alia* that there is no evidence that the tenant and the related party sustained damages recoverable for promissory estoppel. Finally, each side challenges the trial court's refusal to award attorneys' fees.

We initially agreed only with the landlord. Because its opponents presented no evidence that they sustained damages recoverable for a promissory-estoppel claim, we modified that portion of the judgment to eliminate the damages awarded. We further agreed that the landlord is entitled to recover its attorneys' fees; however, we initially remanded the question of whether the fees are recoverable only from the tenant or from both the tenant and the related party. After considering the parties' cross-motions for rehearing, however, we agree with the landlord that the related party is jointly and severally liable with the tenant for the landlord's attorneys' fees, and we agree with the tenant and the related party that the evidence is insufficient to support all of the landlord's attorneys' fees assessed by the jury. We therefore grant in part both of

the cross-motions for rehearing. Because the landlord has stated that it prefers to accept a suggestion of remittitur rather than to relitigate the amount of its attorneys' fees, we suggest remittitur, and subject to the landlord's acceptance of remittitur, we modify the judgment to eliminate the damages awarded to the tenant and the related party, and we hold them jointly and severally liable to the landlord for a reduced amount of attorneys' fees. As modified, we affirm the trial court's judgment.

## I. BACKGROUND

We summarize the background of this case in accordance with the legal-sufficiency standard of review. First, however, we will clarify the parties' identities and their respective roles.

Defendant/appellee Calvary Christian Fellowship ("Calvary") owns a commercial building, a portion of which it leased to Reliant Engineering and Machine US ("Reliant"). When Calvary entered into the lease agreement in the spring of 2011, it believed that Reliant was the assumed name of sole proprietor Sam Range, who signed the lease. According to the evidence at trial, however, Reliant is the name under which the Martha Range Trust, through its trustee Connie Range, does business. Thus, when we speak of "Reliant," we are speaking of plaintiff/appellant Connie Range in her capacity as trustee of the Martha Range Trust.[1] When we refer to Sam, we are referring to intervenor/appellant Sam Range in his individual capacity.[2]

1. This is the same definition used without objection in the jury charge.

2. Although we normally refer to an individual by the person's last name, we will mention

## A. The Lease's Key Terms

The lease contains three provisions that are especially pertinent to this appeal. First, a special provision states that if Calvary decides to sell the property during the original 60-month term of the lease, Reliant has a thirty-day first right of refusal to enter into a sales contract to purchase the property on the specific terms in the lease. Second, another special provision states that if additional space becomes vacant, Reliant has a thirty-day first right of refusal to lease the additional space on the same terms on which it leased the original space, except that the lease of the additional space will expire with the expiration of the original sixty-month lease. And third, a clause in the lease states that any person who prevails in a legal proceeding "related to the transaction described in this lease" is entitled to recover reasonable attorneys' fees from the nonprevailing party.

## B. The Purchase Negotiations

In March 2012, Sam began to discuss with Calvary's Mark Brocato whether Reliant would lease additional space that was about to become available, or alternatively, whether Calvary would agree to sell the property on terms differing from those stated in the lease. Brocato sent an email to Sam on March 29, 2012 describing the terms they discussed and concluding, "I will have the contract drawn up and get it to you as quickly as possible."

The terms Sam and Brocato discussed differed significantly from the purchase terms stated in the lease. The lease states that if Calvary decides to sell the property during the original 60-month term of the

three members of the Range family in the course of this opinion, and thus, we will use each person's first name to refer to the person in his or her individual capacity.

lease, then Reliant "has· a first right of refusal to enter into a sales contract to purchase [the] property at $1,200,000 with 20% down with 5% interest with a 30 year amortization with a 5 year balloon." The terms stated in the email list the same purchase price of $1.2 million, a 30-year amortization, and a 5-year balloon payment, but the interest rate stated in the email is 6% and the $240,000 down payment is eliminated entirely. The email also specifies that the monthly payments would be $10,007, and that "all lease contracts are sold with the building." According to Sam and·Reliant, this email was itself an offer to sell, which one or both of them accepted.

·Calvary's attorney Duke Keller at Weycer, Kaplan, Pulaski & Zuber, P.C. ("Weycer Kaplan") drew up the contract and sent it to Sam. The contract called·for Sam to pay earnest money of $10,000, which was to be applied to ·the first monthly payment. Sam's and Reliant's attorney Frank Svetlik reviewed the contract and sent it back with revisions. Among other things, Sam and Reliant (1) crossed out Sam's name as "Buyer" and instead identified the buyer as "New Entity"; (2) reduced the total monthly payment by 18%, from $10,007, as stated in the email, to $8,200; (3) required Calvary to provide the buyer a recent survey; (4) required Calvary to provide the buyer with estoppel letters from the tenants; (5) required Calvary to pay for a title policy; (6) eliminated the earnest-money requirement; (7) deleted the requirement for any financial statements from the buyer; (8) eliminated Calvary's right to declare the outstanding principal and interest due if the buyer sold or conveyed the property without Calvary's consent; and (9) made Calvary's loan to the buyer a non-recourse loan. Calvary did not accept the revisions and further negotiations eventually were abandoned.

## C. The Lease of Additional Space

When the parties were unable to agree on the terms of the sales contract, their discussions turned to Reliant's right to lease additional space. Reliant wanted the additional. space separately metered for electricity at Calvary's expense, but Calvary refused. Although the thirty-day first right of refusal was extended while the parties continued negotiations, they were unable to reach an agreement.

## D. The Parties' Claims

To resolve these disputes, Reliant sued Calvary for breach of the alleged agreement to sell the property, breach of the lease, promissory estoppel, common-law fraud, statutory fraud, fraudulent inducement, negligent misrepresentation, and violations of the Deceptive Trade Practices–Consumer Protection Act. Reliant also asked for an injunction to prevent Calvary from selling the property to anyone other than Reliant or Reliant's assignee, and sought specific performance of Calvary's alleged promise to sell the property to Reliant on the terms stated in the March 29, 2012 email.

. Calvary disputed whether Reliant or Sam was the tenant under the lease, so Sam intervened in the action, after which the trial court generally referred to both Reliant and Sam as "the plaintiffs." Pleading in the alternative, Sam stated that if Reliant was not the tenant, or Reliant did not do business at the material time, or Sam lacked authority to execute the lease as Reliant's agent, then Sam was the tenant and did business as Reliant. Under the alternative pleading that Sam was the tenant, Sam asserted the same claims Reliant had asserted.

Calvary counterclaimed against both Reliant and Sam for declaratory judgment

and for breach of the lease, but later abandoned its claim for money damages.

### E. Reliant's Motion to Disqualify Calvary's Counsel

Before trial, Reliant moved to disqualify Weycer Kaplan from representing Calvary. According to Reliant, Weycer Kaplan had a twenty-year history of representing it and companies or entities formed or owned by Reliant jointly or individually. Reliant also alleged that Weycer Kaplan acted as an intermediary in the sales negotiations between Calvary and Reliant, and that when the law firm prepared the proposed sales contract, the firm was representing both Calvary and Reliant. Based on these allegations, Reliant argued that it was not only a former client of the law firm, but also a current client. The trial court denied the motion to disqualify the firm.

### F. The Trial's Outcome

At the close of evidence, the jury was asked to determine (1) if Calvary intended to bind itself to an agreement with Reliant and/or Sam requiring Calvary to sell the property and the leases to either or both of them on the terms stated in the March 29, 2012 email; (2) if Calvary failed to comply with the lease; (3) if Reliant failed to comply with the lease; (4) if Calvary committed fraud against Sam, Reliant, or both; and (5) if Calvary committed statutory fraud against Sam, Reliant, or both. The jury answered all of these questions, "No." The jury also was asked whether Reliant or Sam substantially relied to their respective detriment on Calvary's promise to sell the property, if any, and whether the reliance was foreseeable by Calvary. The jury answered "yes" as to both Sam

and Reliant. The jury found that the amount of $6,350 was necessary to restore Reliant to the position it would have occupied had it not acted in reliance on that promise in the past, and that $5,000 was necessary to restore Sam to his pre-reliance position. The jury assessed no damages for Sam's and Reliant's reliance on the promise in the future. Finally, the jury was asked to determine each side's reasonable and necessary attorneys' fees.[3] The jury assessed identical amounts for "Reliant and/or Sam Range's" attorneys' fees and for Calvary's attorneys' fees: $232,000 for representation in the trial court, and up to an additional $80,000 for appeals.

The trial court initially rendered judgment awarding Sam and Reliant damages on their promissory-estoppel claims but denying each side's request for attorneys' fees. Both sides moved to modify the judgment and for judgment notwithstanding the verdict. The trial court modified the judgment to include certain declarations that Calvary had requested and to add, "The Plaintiffs only recovered on a claim for promissory estoppel for which no award of attorney's fees is permitted. And, even if such an award was permitted, it would be offset by an award in favor of the Defendant as the prevailing party under the Lease."

Both sides appeal the judgment.

### II. ISSUES PRESENTED

In their first three issues, Sam and Reliant contend that the trial court erred in allowing the jury to determine whether Calvary intended to bind itself to sell the property and the leases to one or both of them on the terms stated in Brocato's March 29, 2012 email. Sam and Reliant

---

3. By agreement of the parties, questions about the amounts of their attorneys' fees

were not predicated on any liability findings.

maintain that the email is a contract and its enforceability is a question of law. They further argue that the evidence conclusively establishes that the email was a binding offer, which one or both of them accepted. In their fourth issue, they assert that Reliant is entitled either to specific performance of Calvary's promise to sell the property on the terms stated in the email or to an award of damages for breach of that promise. Sam and Reliant argue in their fifth issue that the evidence conclusively establishes that Calvary breached the lease by failing to lease additional space to Reliant. In their sixth and seventh issues, Sam and Reliant challenge the trial court's refusal to award them attorneys' fees, and in their eighth issue, they argue that the trial court abused its discretion by denying Reliant's motion to disqualify Weycer Kaplan from representing Calvary.

Calvary presents two issues in its cross-appeal, arguing that Sam and Reliant are not entitled to judgment on their promissory-estoppel claim and that the trial court erred in failing to award Calvary its attorneys' fees.

## III. THE ALLEGED PURCHASE AGREEMENT

In each of Sam's and Reliant's first three issues, they challenge the jury's negative answers to two questions on which they bore the burden of proof at trial. Both jury questions are concerned with whether Brocato's March 29, 2012 email is a binding agreement; the difference between the two is that one question allowed the jury to find that the email was a stand-alone agreement while the other question permitted the jury to find that the email was a modification of the lease. Because Sam and Reliant make the same arguments for disregarding the jury's answers to each of those answers, we address the arguments regarding these questions together.

### A. The Evidence Does Not Conclusively Establish that Calvary Agreed to Sell the Property on the Terms Stated in the March 29, 2012 Email.

To overcome an adverse fact-finding on a matter on which it bears the burden of proof, a party must demonstrate on appeal that the evidence conclusively establishes the disputed fact in that party's favor. *See Associated Indem. Corp. v. CAT Contracting, Inc.*, 964 S.W.2d 276, 284 n.7 (Tex. 1998). To determine whether the evidence conclusively establishes a fact, we review all of the evidence in the light most favorable to the finding, indulging every reasonable inference that would support it. *See City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We credit favorable evidence if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not. *See id.* at 827. Evidence is conclusive if it would not permit reasonable jurors to differ about the factual determination. *See Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 340 (Tex. 1998). Testimony from interested witnesses is conclusive "only if the testimony could be readily contradicted if untrue, and is clear, direct, and positive, and there are no circumstances tending to discredit or impeach it." *Lofton v. Tex. Brine Corp.*, 777 S.W.2d 384, 386 (Tex. 1989); *Ramco Oil & Gas, Ltd. v. Anglo Dutch (Tenge) L.L.C.*, 171 S.W.3d 905, 911 (Tex. App.— Houston [14th Dist.] 2005, no pet.).

Sam and Reliant assert that there was no question of fact about whether the parties had an enforceable agreement that Calvary would sell the property on the terms stated in the email because whether an enforceable agreement exists is a question of law. They therefore contend that the trial court abused its discretion in asking the jury if Calvary intended to be bound by the email. *See Grohman v. Kahlig*, 318 S.W.3d 882, 887 (Tex. 2010) (per

curiam) ("A trial court commits error if it submits a question of law to the jury."). Sam and Reliant further argue that the evidence conclusively establishes that Calvary intended to bind itself to sell the property to one or both of them on the terms stated in the email. *See id.* ("Whether a party has breached a contract is a question of law for the court, not a question of fact for the jury, when the facts of the parties' conduct are undisputed or conclusively established."). For all of these reasons, Sam and Reliant conclude that the jury's answers to these questions are immaterial and that the trial court erred in failing to disregard them. *See Spencer v. Eagle Star Ins. Co. of Am.,* 876 S.W.2d 154, 157 (Tex. 1994) (explaining that a jury finding may be disregarded if it is unsupported by evidence or is immaterial, and that a question is immaterial if it should not have been submitted, has been rendered immaterial by other findings, or calls for a finding beyond the jury's province).

■ Although Sam and Reliant are correct in stating that whether a contract is enforceable is a question of law,[4] they overlook the preliminary factual question of whether the email was intended to be a contract at all.

■ When parties anticipate signing a formal contract, the question of whether they intended to bind themselves before the formal contract is executed is usually a question of fact. *See R.R. Comm'n of Tex. v. Gulf Energy Expl. Corp.,* 482 S.W.3d 559, 572–73 (Tex. 2016); *Foreca, S.A. v. GRD Dev. Co., Inc.,* 758 S.W.2d 744, 744–

46 (Tex. 1988); *Scott v. Ingle Bros. Pac., Inc.,* 489 S.W.2d 554, 555–57 (Tex. 1972). The face of the email shows that Calvary intended there to be a later formal contract, because Brocato stated in the email, "I will have the contract drawn up and get it to you as quickly as possible." Thus, whether Calvary intended the email to be binding in advance of the contract is a question of fact. It therefore was appropriate for the trial court to submit that issue to the jury. *Compare Scott,* 489 S.W.2d at 557 (reversing and remanding a contract cause of action where the trial court failed to ask "whether the parties intended for there to be a contract of employment under the basic terms set out in the 'purchase agreement'") *with Murphy v. Seabarge, Ltd.,* 868 S.W.2d 929, 933–34 (Tex. App.—Houston [14th Dist.] 1994, writ denied) ("[T]he question of the parties' intent was not established as a matter of law and was properly submitted to, and answered by, the jury in fulfillment of its fact finding responsibilities.").

In the instructions accompanying the question about whether Calvary intended to be bound, the jury was told it could consider "what [the parties] said and did in light of the surrounding circumstances, including any earlier course of dealing. You may not consider the parties' unexpressed thoughts or intentions." The surrounding circumstances that the jury could consider included

- Calvary's expressed understanding;[5]
- Conversations about the transaction;[6]
- Calvary's internal emails;[7]

---

4. *See Parker Drilling Co. v. Romfor Supply Co.,* 316 S.W.3d 68, 72 (Tex. App.—Houston [14th Dist.] 2010, pet. denied).

5. *See Gulf Energy Expl. Corp.,* 482 S.W.3d at 573–74.

6. *See id.*

7. *See WTG Gas Processing, L.P. v. ConocoPhillips Co.,* 309 S.W.3d 635, 650–51 (Tex. App.—Houston [14th Dist.] 2010, pet. denied) (defendant company's internal emails reflected its view that it had not yet formed a binding contract).

- Sam's return of the sales contract with revisions;[8] and

- Calvary's continuing negotiations after Sam returned the redlined contract.[9]

We conclude that the evidence of the circumstances before and after Brocato's March 29, 2012 email support the jury's finding that Calvary did not intend to be bound by it.

Taking those circumstances in chronological order, the evidence shows that on the morning of March 27, 2012, Sam emailed Brocato about their discussion of new terms, asking, "Will we have paper work this week?" Brocato responded that he had just written a proposal up and "sent it to the board," adding, "As soon as I get the responses, I will forward to you for your review."

The next day saw several email exchanges between Brocato and members of Calvary's board. Brocato explained that Sam wanted to lease additional space, or alternatively, to buy the building. One board member asked whether Calvary would have a priority lien against the building and whether the sale would be "as is" so that Calvary would not need to make any repairs before a sale. Another asked why Sam had agreed in the lease to terms that included a down payment "and now does not want to follow the original agree-

ment." Brocato responded, "Concerning the lien rights and 'as is,' we will (as intended) have our attorney draw up the sales document to be sure we are protected." Brocato also stated, "NOTE: I do not know that these will be the final terms. All I know is that he wants to buy now at $0 down." Brocato closed by saying, "I will send this to him and let him respond. I will forward the response when I get it."

After Calvary's attorney at Weycer Kaplan drew up the contract and sent it to Sam, Sam's and Reliant's attorney Frank Svetlik reviewed the contract and returned a redlined version. When sending the revised version to Brocato, Sam wrote, "We are submitting this documents [sic] without waiving our rights to lease the space." Because Sam and Reliant would have no reason to make this statement if Calvary already had bound itself to sell the building and the leases to one or both of them, reasonable jurors could interpret Sam's continuing reservation of "our rights" to lease additional space as an acknowledgment that Calvary did not intend to be bound to sell the building and the leases on the terms stated in the email.

Finally, Sam's and Reliant's revisions to the contract not only illustrate that the parties understood that they were still in negotiations, but that the parties had not agreed on material terms. For example, Brocato's March 29, 2012 email called for

8. *See Murphy*, 868 S.W.2d at 933 ("Actions may manifest an intent to be bound to an agreement, even though the parties may expressly provide a formal contract will be executed in the future."); *see also Liquids Dispatch Line v. Tex. Power & Light Co.*, 6 S.W.2d 169, 169–70 (Tex. Civ. App.—Dallas 1928, writ ref'd) (affirming trial court's conclusion that parties did not intend to be bound by an informal agreement where the defendant included terms in the formal agreement that had not yet been discussed, and plaintiff countered with revisions to the additional terms); *Principal Life Ins. Co. v. Revalen Dev., LLC*, 358 S.W.3d 451, 452–54, 456 (Tex.

App.—Dallas 2012, pet. denied) (where a plaintiff claimed there was a binding contract but nevertheless returned the defendant's written contract with revisions, including a change to the transferee's name, the redlined contract was "highly relevant in determining whether the parties believed they were already contractually bound").

9. *See Revalen Dev.*, 358 S.W.3d at 456 (explaining that by continuing its negotiations, the defendant demonstrated its belief that a binding contract had not yet been formed).

the buyer to pay $10,007 per month, of which $7,194.61 was attributable to principal and interest and $2,812.39 was "additional premium." According to the evidence at trial, the "additional premium" was the amount needed to bring the buyer's total monthly payment up to the amount that Calvary would have received in rent if the property were fully occupied. The contract Calvary sent to Sam required monthly payments in these amounts. Sam's and Reliant's revisions, however, would have reduced the "additional premium" by approximately two-thirds. Under Sam's and Reliant's version of the contract, the buyer would pay only $8,200 each month, so that Calvary would receive $21,000 less per year than it would receive from simply leasing all the space. Sam and Reliant also would have made Calvary's $1.2 million loan without recourse, and would have eliminated all of Calvary's legal and equitable remedies for default except for those specifically listed in the closing documents.

Sam and Reliant also changed the buyer's identity from "Sam Range" to an unnamed "New Entity." Although the redlined version of the contract does not tell us who the intended buyer was, it does tell us who the intended buyer was not. We know the proposed buyer was not Sam, because Sam and Reliant crossed Sam's name from the contract. We also know that the proposed buyer was not Reliant. Reliant was a current tenant, and Calvary's proposed contract required the buyer at closing to pay all unpaid rent and utility charges due to Calvary under the lease. Sam's and Reliant's attorney deleted that provision and wrote in its place, "The buyer has no lease with seller." If the buyer had no lease with Calvary, then the buyer could not have been Reliant. Although the identity of the transferee is a material term in a contract for the sale of real estate,[10] the "new entity" was never identified.

In their motion for rehearing, Sam and Reliant suggest that after Calvary sent its March 29, 2012 email, it acted as though it believed it had a binding agreement to sell the property. They argue that Calvary's intent to be bound was conclusively established because Calvary gave them the keys to the property and the information about the other tenants' leases. In support of this position, they cite Sam's testimony, "Mark: Here's the deal. We've got the keys. Here's the tenant's information. And we thought it was done." Not only is this testimony ambiguous, but reasonable jurors could have failed to find Sam's testimony credible. Moreover, the information about the other tenants' leases was not relayed as a partial performance of the alleged contract; it was included in the March 29th email itself.

Given all of the foregoing, it cannot be said that Sam and Reliant conclusively established that Calvary intended to be bound by Brocato's March 29, 2012 email or that the email modified the lease with Reliant. We accordingly overrule Sam's and Reliant's first three issues. Our disposition of these issues renders moot Sam's and Reliant's fourth issue, in which they argue that, as a result of Calvary's failure to sell the property on the terms stated in the email, Reliant is entitled to an order for specific performance or to an award of damages.

### B. Sam and Reliant Are Not Entitled to Recover on Their Promissory-Estoppel Claims.

 Calvary's first cross-issue also concerns its alleged promise in the March 29, 2012 email to sell the property to Sam, Reliant, or both. The jury found that both

10. *See id.*

Sam and Reliant foreseeably relied to their detriment on Calvary's promise, and the jury assessed damages in the amount necessary to restore each of them to the position each would have occupied absent such reliance. Calvary argues, *inter alia*, that there is no evidence of such damages. We agree.

■■■■ A party's recoverable damages are determined not only by the evidence presented at trial, but also by the theory of liability on which the party prevails. For example, a party prevailing on its breach-of-contract claim may recover expectation damages, that is, the party may recover as damages the amount necessary to place it in the position it would have occupied if the contract had been performed. A successful promissory-estoppel claimant's recovery, however, is limited to reliance damages, that is, the party may recover only the amount necessary to restore it to the position it would have occupied if it had not relied on the adverse party's promise. *See Wheeler v. White*, 398 S.W.2d 93, 97 (Tex. 1965); *Bechtel Corp. v. CITGO Products Pipeline Co.*, 271 S.W.3d 898, 926 (Tex. App.—Austin 2008, no pet.). Stated differently, expectation damages place the plaintiff in the new position it would have occupied if the defendant's promise had not been breached, whereas reliance damages return the plaintiff to the same position it would have continued to occupy if the defendant's promise had not been made. Sam and Reliant prevailed only on their promissory-estoppel theory; therefore, they could recover only reliance damages.

Sam and Reliant submitted multiple theories of liability to the jury but presented evidence of only one damages model. According to Sam and Reliant, their damages were equal to (1) the amount one or both of them would have received from the other tenants' leases if Calvary had not breached the alleged agreement to sell the property, and (2) the amount that either or both of them would have had to spend to buy raw land and build a new facility equivalent to the building that Calvary allegedly agreed to sell them. They argued to the jury that their past lost rental income from the property's other tenants was $142,320; that their future lost rental income was $142,320; and that the cost to buy land and build a new facility would be $1,586,609—amounts totaling $1,871,249. But, before Calvary made the alleged promise contained in the email, neither Sam nor Reliant owned the land or the building, and neither of them had a right to the property's rental income.[11] Thus, the damages they sought could not be reliance damages, because these amounts would not restore Sam and Reliant to the positions they occupied before Brocato sent the email on March 29, 2012, but would instead enrich them by more than $1.87 million. Although the jury assessed a total of only $11,350 on Sam's and Reliant's promissory-estoppel claims rather than the $1.87 million they sought, Sam and Reliant provide no explanation or citation to the evidence to support even this amount as

11. Because no one alleged that Calvary promised to convey to Sam or to Reliant a newly constructed, tenanted building at no charge, these amounts cannot even be properly characterized as expectation damages. *Cf. Westminster Falcon/Trinity L.L.P. v. Chong Shin*, No. 07-11-0033-CV, 2012 WL 5231851, at *2 (Tex. App.—Amarillo Oct. 23, 2012, no pet.) (mem. op.) ("In cases where a vendor has the ability to perform, but is unwilling to do so, the measure of damages for breach of contract to sell real estate is the difference between the contract price and the market value of that property at the time of breach."); *Corpus Christi Dev. Corp. v. Carlton*, 644 S.W.2d 521, 522 (Tex. App.—Corpus Christi 1982, no writ) (same); *Broady v. Mitchell*, 572 S.W.2d 36, 42 (Tex. Civ. App.—Houston [1st Dist.] 1978, writ ref'd n.r.e.) (same).

reliance damages. Our own review of the record has uncovered no support for the award.

In their motion for rehearing, Sam and Reliant argued that Reliant sustained reliance damages because Sam testified that Reliant put up a sign in reliance on Calvary's promise to sell the property, and that Reliant incurred costs of $5,000–$6,000 to take down the sign and remount it on a trailer after the proposed deal fell through. This, however, mischaracterizes the record. Sam testified that the sign "had been there forever, *until which time this dispute started.*" After the dispute about the sale of the property began, Calvary pointed out that the lease forbade Reliant from erecting a sign without Calvary's written consent. Sam testified that Reliant then removed the sign "and remounted it to a trailer at a large expense, about five, $6,000." Connie Range testified that the sign had always been a trailer-mounted temporary sign. She stated that the sign was erected for the company's grand opening as a NAPA-certified shop and that Reliant left in place for over a year "because we could not get our deal with the church." There is no evidence that Reliant erected the sign in reliance on Calvary's alleged promise to sell the property.

Because there is legally insufficient evidence that Sam and Reliant sustained reliance damages, the trial court erred in failing to grant Calvary's motion for judgment notwithstanding the verdict on this issue. We sustain Calvary's first cross-issue, and we modify the judgment to eliminate the damages awarded to Sam and Reliant on their promissory-estoppel claims.

## IV. THE PROPOSED LEASE
### OF ADDITIONAL SPACE

Sam's and Reliant's fifth issue concerns the charge question in which the jury was asked whether Calvary failed to comply with the lease. Sam and Reliant contend that the trial court erred in refusing to disregard the jury's negative answer because they conclusively established that Calvary failed to comply with the lease provision, "If additional space becomes vacant, tenant has [a] 30 day first right of refusal for this space with the same terms expiring with [the] original 60 month lease."

In support of this argument, Sam and Reliant first point out that in a May 5, 2012 email to Calvary board member Bruce Todd, Brocato stated that he had prepared a lease amendment but had not sent it to Sam. According to Sam and Reliant, this evidence means that Calvary "effectively denied" Calvary's request to lease additional space.

In making this argument, Sam and Reliant not only ignore what Brocato's email actually says, but also fail to mention that it was their own attorney who drafted the first proposed lease amendment. In his email to Todd, Brocato explained, "I wrote up the attached amendment 2 for the front lease space before we discussed the purchase contract. It is not complete, nor has it been sent to the board for approval. . . . It was never sent to Sam and is not ready to be sent." Four days later, Brocato emailed Todd that he could not access the website from which he tried to obtain a form lease. Todd responded the next morning by emailing Sam and asking, "Does your attorney have the lease in an editable .pdf format as we discussed?" Sam responded that his attorney Frank Svetlik "has already prepared the lease." By the following day, Calvary had received the draft lease amendment from Sam's and Reliant's attorney and returned a redlined copy. The parties continued to negotiate well past the thirty-day mark, but were unable to come to an agreement.

Sam and Reliant next argue that "what killed the deal" on the lease of additional space was Calvary's refusal to bear the cost of having the new space separately metered for electricity. Because Calvary was required to offer the additional space on the same terms as the original lease, Calvary's failure to have the additional space separately metered breached the lease only if the lease required Calvary to have the originally leased space separately metered.

The lease does not contain such a requirement. It states that the tenant is responsible for all utility charges and all connection charges, and that the tenant is to pay these charges directly to the utility service provider. If, however, Calvary is liable for and pays any utility or connection charges for which the tenant is responsible, then the tenant must immediately reimburse Calvary. Finally, the lease states that it is the tenant's responsibility to determine if all necessary utilities are available and adequate for the tenant's intended use.

Sam and Reliant argue that Calvary was required to have the additional space separately metered because the space Reliant originally leased was separately metered before the lease was signed. But, Calvary was required only to offer the additional space on the same terms as those stated in the existing lease; it was not required to place the additional space in the same condition as the originally leased space. To the contrary, the lease states, "Tenant has inspected the leased premises and accepts it in its present (as-is) condition unless expressly noted otherwise in this lease. Landlord and any agent have made no express or implied warranties as to the condition . . . of the leased premises. . . ." The original space's "as-is" condition included separate electrical metering; the additional space's "as-is" condition did not.

Because Sam and Reliant failed to conclusively establish that Calvary failed to comply with the lease, we overrule this issue.

## V. THE ATTEMPT TO DISQUALIFY CALVARY'S COUNSEL

Having addressed all of the substantive liability issues, we turn now to the ancillary issues. In the first of these, Sam and Reliant challenge the trial court's denial of two motions to disqualify Weycer Kaplan from representing Calvary. Although the record contains orders signed in 2014 and 2015 denying such motions, the motion denied in 2015 is not in the record. We therefore discuss only Reliant's 2014 denial of a motion to disqualify opposing counsel.[12]

We review the trial court's denial of a motion to disqualify under the abuse-of-discretion standard. *See Metro. Life Ins. Co. v. Syntek Fin. Corp.*, 881 S.W.2d 319, 321 (Tex. 1994) (per curiam). When reviewing a ruling for abuse of discretion, we do not substitute our judgment for that of the trial court, but instead determine whether the trial court acted in an arbitrary or unreasonable manner, or without reference to any guiding rules or principles. *See Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Hendricks v. Barker*, 523 S.W.3d

12. Sam and Reliant present no argument regarding the later motion to disqualify, and they do not mention the later motion's contents or the evidence on which it relied. If the two motions relied on the same arguments and evidence, then our review of one motion addresses the substance of both. If the two motions were different, then Sam and Reliant have waived review of the later motion by failing to address the arguments and evidence on which the later motion relied.

152, 157 (Tex. App.—Houston [14th Dist.] 2016, no. pet.).

Reliant moved to disqualify Weycer Kaplan on the grounds that Reliant, Sam, Connie Range, Martha Range, and the Martha Range Trust [13] are all current and former clients of the law firm, so that the firm's representation of another client with interests adverse to theirs violates the Texas Disciplinary Rules of Professional Conduct.

## A. The Trial Court Did Not Abuse Its Discretion in Impliedly Failing to Find that Reliant or an Affiliated Person or Entity Is a Current Weycer Kaplan Client.

Reliant contends that Sam, Connie, Martha, and the Trust are all Weycer Kaplan's current clients, and thus, the firm's representation of Calvary violates Texas Disciplinary Rules of Professional Conduct 1.06 and 1.07. Before addressing the content of those Rules, however, we first must dispose of the threshold question of whether the trial court properly could have failed to find that any of these individuals or the Trust are in fact among Weycer Kaplan's current clients, which the firm denies. See *Tanox, Inc. v. Akin, Gump, Strauss, Hauer & Feld, L.L.P.*, 105 S.W.3d 244, 254 (Tex. App.—Houston [14th Dist.] 2003, pet. denied) (explaining that, absent conclusive evidence, it is a question of fact whether an attorney-client relationship exists).

An attorney-client relationship may be expressly created by a contract or implied from the parties' actions. See *id.* at 254–55. Whether a law firm impliedly agreed to represent the alleged client in a particular matter is determined by looking solely to the parties' objective words and actions. See *id.* The alleged client's subjective belief that the attorney agreed to the representation is not relevant. *Id.* at 254.

Given the conflicting evidence, the trial court did not abuse its discretion in impliedly failing to find that Sam, Connie, Martha, and the Trust were current Weycer Kaplan clients. Sam testified that the law firm established the Martha Range Trust for Sam's mother Martha from 1997 to 1998, and that to his knowledge, the firm's representation never terminated; however, Weycer Kaplan shareholder and custodian of records Tanya Garrison testified that there are no records that the firm set up the Trust or ever represented it. The trial court heard evidence that during attorney Ed Rothberg's employment at Weycer Kaplan, he represented Sam individually in two bankruptcies in the 1980's and late 1990's; represented Sam in connection with matters of refinancing and reconstruction during the bankruptcies; represented Martha Range in connection with an IRS subpoena in 1997; represented Sam and Connie in a tax case in 2002; and represented Sam again in connection with an IRS lawsuit in 2003–04. Sam also testified that Rothberg represented "our interest" in real estate transactions in the 1980's and 1990's, and that the properties were owned variously by Sam's mother, or by his father, or by the Trust, or jointly by Sam and Connie.

---

**13.** We speak of the Trust separately from Reliant because we have used "Reliant" as it was used in the jury charge, that is, we use "Reliant" to mean Connie Range in her capacity as trustee of the Martha Range Trust. The evidence presented in connection with Reliant's motion to disqualify Weycer Kaplan includes testimony about more distant events when Sam was the trustee or times during which we cannot identify the trustee. Thus, we use "the Trust" in this section to mean the then-current trustee of the Martha Range Trust, in that person's capacity as trustee, whether that person was Sam or Connie.

This history does not suggest that Sam, Connie, Martha, or the Trust were clients of Weycer Kaplan at the time of the events in this suit, because unless the parties agree otherwise, an attorney-client relationship generally terminates "upon the completion of the purpose of the employment." *Stephenson v. LeBoeuf*, 16 S.W.3d 829, 836 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). There is no evidence that the bankruptcies, refinancing, reconstruction, and real estate transactions of the 1980's and 1990's; the trust formation of 1997–1998; or the tax cases of 1997–2004 were still pending when Calvary employed Weycer Kaplan in connection with this case in March 2012. To the contrary, Weycer Kaplan produced a copy of a letter to Sam and Connie from September 2002 in which Rothberg advised them, "we are hereby terminating the attorney-client relationship." Moreover, Rothberg left Weycer Kaplan for another law firm in approximately December 2009, and Sam and Reliant retained Rothberg's services through his subsequent firm during this litigation.

Sam also testified that he believes Weycer Kaplan was an intermediary between himself or Reliant and Calvary during the purchase negotiation, but no evidence supports this. When Garrison questioned Sam why he believed that Weycer Kaplan was working as an intermediary when it prepared the sales contract, Sam answered, "I asked [Frank Svetlik] were you … [w]ere you guys our lawyer? Could you handle it? And he said: Let him do it. And that's what we did." Although we cannot tell from this ambiguous testimony what Svetlik meant, it is clear that Svetlik was the person who said, "Let him do it." Svetlik was Sam's and Reliant's attorney, but there is no evidence that he was ever employed by Weycer Kaplan; Svetlik's letterhead indicates that he is a solo practitioner. Sam's subjective belief that Weycer Kaplan represented him or Reliant is not based on any objective communication or conduct by or on behalf of the firm or its attorneys, and his interpretation of an ambiguous statement made in a private conversation by someone unaffiliated with the law firm could not create an attorney-client relationship between Sam or Reliant and Weycer Kaplan.

We conclude that the trial court did not abuse its discretion in rejecting the argument that Weycer Kaplan must be disqualified on the ground that Reliant or an affiliated person or entity is a current client of the firm.

### B. The Trial Court Did Not Abuse Its Discretion in Impliedly Failing to Find that This Matter Is Substantially Related to the Firm's Prior Representation of Reliant or of an Affiliated Person or Entity.

Reliant also argues that because Weycer Kaplan previously represented it and affiliated individuals or entities, the firm's representation of Calvary in this suit violates Texas Disciplinary Rules of Professional Conduct 1.05 and 1.09. *See* TEX. RULES DISCIPLINARY P. R. 1.05, 1.09, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G, app. A-1 (West Supp. 2016). As we have just seen, there is conflicting evidence about whether Weycer Kaplan ever represented the Trust; thus, the record supports the trial court's implied failure to find that the Trust is a former client of the firm. On the other hand, it is undisputed that Sam, Connie, and Martha Range are former clients of the firm. We accordingly proceed to the next step in our analysis, and examine the Disciplinary Rules that Reliant contends required the firm's disqualification.

Rule 1.05 generally bars an attorney from knowingly using or disclosing a

client's confidential information without the client's consent, while Rule 1.09 addresses circumstances in which an attorney is disqualified from representing a person in a matter adverse to a former client without the former client's prior consent. Because Rule 1.09 incorporates Rule 1.05, we do not separately examine Rule 1.05 in detail.

Under Rule 1.09(a), an attorney is disqualified from representing a person in a matter adverse to the former client in three circumstances. First, the attorney cannot represent a person in a matter in which the person questions the validity of the attorney's work for the former client. *See* TEX. RULES DISCIPLINARY P. R. 1.09(a)(1). Reliant has not sought to disqualify Weycer Kaplan from representing Calvary on this ground.

The remaining two grounds for disqualification under Rule 1.09(a) largely overlap. An attorney cannot represent a person in a matter adverse to a former client if it is reasonably probable that the attorney's representation of the other person will involve a violation of the attorney's obligation under Rule 1.05 to refrain from revealing the former client's confidential information or using it against the former client. *See* TEX. RULES DISCIPLINARY P. R. 1.09(a)(2). An attorney also cannot represent a person in a matter adverse to the former client if the attorney represented the former client in the same or a substantially related matter. *See* TEX. RULES DISCIPLINARY P. R. 1.09(a)(3). These two provisions overlap, because to establish that two matters are the same or substantially related, the party seeking to disqualify opposing counsel must prove by a preponder-

ance of the evidence that factual matters involved in the prior representation are so related to the facts in the pending litigation that it creates a genuine threat that the confidences the movant shared with the attorney will be passed on to the movant's adversaries. *See NCNB Tex. Nat'l Bank v. Coker*, 765 S.W.2d 398, 400 (Tex. 1989) (orig. proceeding).

■ To show that the current matter and the former matters are the same or substantially related, the movant must produce "evidence of specific similarities capable of being recited in the disqualification order." *Id.* Reliant did not meet its burden in the trial court to show that Weycer Kaplan previously represented it or an affiliated person or entity in a substantially related matter, nor does Reliant contend otherwise on appeal.

Reliant instead avers that Weycer Kaplan's representation of Calvary created a presumption that the firm would disclose to Calvary the confidential communications between the firm, on one hand, and Sam, Connie, Martha, or the Trust, on the other hand.[14] In support of this position, Reliant relies on *In re Mitcham*, 133 S.W.3d 274 (Tex. 2004) (orig. proceeding) (per curiam) and *Henderson v. Floyd*, 891 S.W.2d 252 (Tex. 1995) (orig. proceeding) (per curiam).

Neither *Mitcham* nor *Henderson* supports Reliant's assertion that courts must presume that a law firm reveals its former clients' confidences to the firm's current clients, without regard to whether the current and the former representation concern the same or a substantially related matter. *Mitcham* and *Henderson* instead address the presumption that an attorney obtains confidential information on all of

---

14. With regard to the Trust, Reliant goes further still, asserting that there is an "irrebut[t]able presumption" that Weycer Kaplan "protect[ed] Calvary by using the Trust's financial data to change the essential terms of

the March 2012 agreement" for the sale of the property. But, as previously mentioned, the evidence supports the trial court's implied failure to find that Weycer Kaplan ever represented the Trust.

the firm's cases, and if the attorney changes law firms, the attorney presumably shares that confidential information with a new employer. The result is that, for the purpose of determining whether a law firm is disqualified from representing a client in a particular matter, the firm's list of former clients effectively includes clients of the firm's attorneys' previous employers during the time of that previous employment. An attorney's current law firm therefore can be disqualified from representing a person adverse to a client of the attorney's prior law firm. But, even then, one seeking to disqualify a law firm on this basis must show that the representation of the former client and the current adverse client concerned the same or substantially related matters. *See Mitcham,* 133 S.W.3d at 275–76 (where a new employer hired an attorney who had worked as a legal assistant on another law firm's defense of asbestos claims against TXU, the new employer was disqualified from representing plaintiffs asserting asbestos suits against TXU); *Henderson,* 891 S.W.2d at 253–54 (where a new employer hired an attorney who had worked for the firm representing the defendant in a personal-injury suit, the new employer was disqualified from representing the plaintiff in the same suit); *see also* TEX. RULES DISCIPLINARY P. R. 1.09(a)(3).

Because Reliant has not shown that Weycer Kaplan represented it or a related party in this matter or in a substantially related matter, we overrule this issue.

## VI. ATTORNEYS' FEES

The final ancillary issue concerns attorneys' fees. Each side contends that it is entitled to recover its fees from the other side. Sam and Reliant maintain that they are entitled to recover attorneys' fees pursuant to Texas Civil Practice and Remedies Code section 38.001, and all parties

seek recovery of their respective attorneys' fees pursuant to a provision in the lease. In their motion for rehearing, Sam and Reliant additionally argue that although the jury assessed Calvary's trial attorneys' fees at $232,000, the evidence supports an award only of $164,714.97. Finally, in their cross-motions for rehearing, Sam and Reliant argue that they are entitled to rendition of judgment that Sam is not jointly and severally liable with Reliant for the fees, while Calvary argues that it is entitled to rendition of judgment holding Sam and Reliant jointly and severally liable. For the reasons discussed below, we conclude that Calvary alone is entitled to an award of its attorneys' fees, but that there is no evidence that its reasonable and necessary trial attorneys' fees were any greater than $164,714.97. We further hold that Sam and Reliant are jointly and severally liable for Calvary's trial and appellate attorneys' fees.

### A. Attorneys' Fees Under Texas Civil Practice and Remedies Code § 38.001.

Section 38.001(8) of the Civil Practice and Remedies Code provides that a person who asserts a claim on an oral or written contract may recover from an individual or a corporation the person's reasonable attorneys' fees "in addition to the amount of a valid claim and costs." *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2015). For attorneys' fees to be "in addition to the amount of a valid claim," the person seeking the fee award must prevail on a contract claim and be assessed damages. *See Ashford Partners, Ltd. v. ECO Res., Inc.,* 401 S.W.3d 35, 40–41 (Tex. 2012). Because no party has satisfied these requirements, no party is entitled to a statutory award of attorneys' fees.

### B. Only Calvary Is Entitled to a Contractual Award of Attorneys' Fees.

Although a party must recover damages to recover attorneys' fees under section 38.001 of the Texas Civil Practice and Remedies Code, parties are free to contract for shifting of attorneys' fees without such limitations. *See Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 653 (Tex. 2009). The lease contains just such a fee-shifting provision.

The lease provides that "[a]ny person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, reasonable attorney's fees, and all other costs of litigation from the nonprevailing party." Thus, to render judgment on this issue as each side requests, we must (1) determine whether this is a proceeding "brought under or related to the transaction described" in the lease, (2) identify the "prevailing party" or parties, and (3) identify any "nonprevailing party" to whom the attorney-fee provision applies.

#### 1. All Claims Were "Brought Under or Related to the Transaction Described" in the Lease.

The "transaction described" in the lease includes Reliant's lease of the premises and two additional, contingent rights added as "special provisions" to the lease. First, if Calvary decided to sell the building during the original sixty-month lease, then Reliant had a thirty-day first right of refusal to buy the building for $1.2 million with a 20% down payment, a thirty-year amortization at 5% interest, and a five-year balloon payment. Second, if additional space became available during the original sixty-month term of the lease, then Reliant had a thirty-day first right of refusal to lease the additional space on the same terms as the existing lease until the end of the original sixty-month term.

The parties appear to agree that their claims were "brought under or related to" the transactions described in the lease, and the record demonstrates that the parties are correct. Calvary sought declarations of the parties' rights under the lease and asserted a claim for its breach. Sam and Reliant characterized their claims as presenting nine causes of action, each of which was brought under the lease or related to one of the lease's general or special provisions.

#### 2. Calvary Is the Prevailing Party.

The contract does not define "prevailing party," so we assume the parties used the phrase in its ordinary sense. *See Bhatia v. Woodlands N. Hous. Heart Ctr., PLLC*, 396 S.W.3d 658, 670 (Tex. App.—Houston [14th Dist.] 2013, pet. denied). As we explained when construing an attorney-fee provision nearly identical to the one in this case, the "contractual provision entitling a 'prevailing party' to recover attorneys' fees does not distinguish between successful prosecution and successful defense of a claim." *Chevron Phillips Chem. Co. LP v. Kingwood Crossroads, LP*, 346 S.W.3d 37, 70 (Tex. App.—Houston [14th Dist.] 2011, pet. denied) (construing the language, "If [a party] is a prevailing party in any legal proceeding brought under or with relation to this contract or this transaction, such party is entitled to recover from the non-prevailing parties all costs of such proceeding and reasonable attorney's fees"). A defendant is the prevailing party if it successfully defends the case, typically by "obtaining a take-nothing judgment on the main issue or issues in the case." *Bhatia*, 396 S.W.3d at 670.

Identifying the "main issue" in the case is straightforward. As Sam and Reliant acknowledge in their brief, "the ulti-

mate question raised in the underlying lawsuit" was whether there was an enforceable agreement for Calvary to sell the property under the terms stated in March 29, 2012 email. Because Calvary defeated that claim, Calvary is the prevailing party.

Sam and Reliant argue that they are the prevailing parties because they have an enforceable judgment awarding them damages on their promissory-estoppel claims. Relying heavily on cases addressing statutory awards of attorneys' fees,[15] Sam and Reliant argue that Calvary cannot be the prevailing party because the jury failed to find that Calvary was entitled to any damages.

This argument rests on the assumptions that (a) when determining who is entitled to a contractual award of attorneys' fees, only one who obtains affirmative relief can be a prevailing party; (b) Sam and Reliant have an enforceable judgment for damages on their promissory-estoppel claim; and (c) Calvary did not prevail on any of its claims. Each of these assumptions is mistaken.

First, the lease does not condition recovery of attorneys' fees on an award of damages; it is sufficient that Calvary defeated the claims against it for approximately $1.87 million. See Bhatia, 396 S.W.3d at 670; see also Parkway Dental Assocs., P.A. v. Ho & Huang Props., L.P., 391 S.W.3d 596, 611 (Tex. App.—Houston [14th Dist.] 2012, no pet.); Kingwood Crossroads, LP, 346 S.W.3d at 72. Second, we have modified the judgment to eliminate the award of promissory-estoppel damages because no evidence supports them. Consequently,

Sam and Reliant have prevailed on none of their claims. And third, Calvary partially prevailed on its requests for declaratory relief, which is the only relief it ultimately sought. Specifically, the trial court included in the modified final judgment declarations that Calvary did not breach the lease; that Calvary did not modify or amend the lease's special provision concerning Reliant's option to purchase the property; and that Calvary complied with all of the lease's option obligations.

Because Calvary is the sole "prevailing party" in this case, Calvary alone is entitled to recover attorneys' fees.

### 3. Calvary's Trial Attorneys' Fees Are Only $164,714.97.

■ The jury assessed Calvary's attorneys' fees at $232,000 for representation in the trial court, $30,000 for representation before an intermediate court of appeals, and in the event of a further appeal to the Supreme Court of Texas, $15,000 for representation at the petition-for-review stage, $25,000 for representation through the merits-briefing stage, and $10,000 for oral argument and completion of proceedings before Texas Supreme Court. In their motion for rehearing, Sam and Reliant argue that no evidence supports an award of trial attorneys' fees of more than $164,714.97. We agree.

Calvary's expert Tanya Garrison testified that Calvary's trial attorneys' fees were $164,714.97. Calvary argues that the $232,000 assessed by the jury is within the range of reasonable attorneys' fees because Sam and Reliant sought $273,000 in trial attorneys' fees; however, even if the

**15.** See, e.g., Farrar v. Hobby, 506 U.S. 103, 111–12, 113 S.Ct. 566, 121 L.Ed. 2d 494 (1992) (reviewing fees awarded under 42 U.S.C. § 1988); Green Int'l, Inc. v. Solis, 951 S.W.2d 384, 390 (Tex. 1997) (addressing attorney-fee awards under Texas Civil Practice and Remedies Code section 38.001); State

Farm Life Ins. Co. v. Beaston, 907 S.W.2d 430, 437 (Tex. 1995) (discussing attorney-fee awards under Texas Civil Practice and Remedies Code section 38.001, the Deceptive Trade Practices–Consumer Protection Act, and former art. 21.21 of the Insurance Code).

evidence were legally and factually sufficient to support Sam's and Reliant's requested attorneys' fees—a question that is not before us—evidence of one side's reasonable and necessary attorneys' fees is not evidence of the opposing side's reasonable attorneys' fees. *See Dilston House Condo. Ass'n v. White*, 230 S.W.3d 714, 717 (Tex. App.—Houston [14th Dist.] 2007, no pet.).

 Anticipating this outcome, Calvary asked in its response to Sam's and Reliant's motion for rehearing that we suggest remittitur rather than remand for a new trial on the issue of attorneys' fees. Sam and Reliant acknowledge that remittitur is an option, but they ask that we remand the question of the amount of Calvary's trial attorneys' fees because Garrison did not refer to all of the *Arthur Andersen* factors in her testimony. *See Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997).

The *Arther Andersen* factors that a factfinder should consider when determining the reasonableness of a fee include:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;

(2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*See id.* Garrison's testimony and the documentary evidence address the time and labor involved (factor 1), the amount involved (factor 4), and that the fees are fixed (factor 8). Garrison also testified to her experience, education, and qualifications (factor 7). She further identified the roles of everyone who billed for work on this case, and she stated that her firm bills at below-market rates (factor 3). Thus, there is some evidence of five of the eight *Arthur Andersen* factors and the record need not contain evidence of every factor. *See Brockie v. Webb*, 244 S.W.3d 905, 909 (Tex. App.—Dallas 2008, pet. denied).

Further, Calvary sufficiently proved up its attorneys' fees using the lodestar method by providing "evidence of the time expended on specific tasks to enable the fact finder to meaningfully review the fee application." *Long v. Griffin*, 442 S.W.3d 253, 253 (Tex. 2014) (per curiam). Garrison produced invoices of the firm's work since the suit was filed, and the invoices identify the task performed, the time spent on the task, the person who performed the work, and the person's hourly rate. Sam's and Reliant's expert Marc Hill testified that he had examined Calvary's attorneys' invoices, and he agreed that Calvary's attorneys' fees of $164,714.97 were "fair, reasonable, and necessary for the work that you've done."

Because the evidence supports an award of no more than $164,714.97 for Calvary's reasonable and necessary trial attorneys' fees, we suggest remittitur of the excess $67,285.03, and Calvary has represented that it will accept. Thus, we partially grant

both Sam's and Reliant's motion for rehearing and Calvary's alternative cross-motion for rehearing.

### 4. Sam and Reliant Are Jointly and Severally Liable for Calvary's Attorneys' Fees

We now must identify the "nonprevailing" party or parties who are bound by the attorney-fee provision.

■■■ As part of the lease, the attorney-fee provision is binding on the parties to that contract. The lease identifies the contracting parties as Calvary and "Reliant Engineering and Machine US." The jury charge defined the lease as "the agreement between Calvary and Reliant" and defined "Reliant" as "Plaintiff, Connie Range as Trustee of the Martha Range Trust d/b/a Reliant Engineering and Machine US." No one objected at trial to these definitions, which are supported by the evidence. Indeed, Reliant admits that it is a party to the lease. Because Reliant accordingly is bound by the attorney-fee provision, Reliant is a "nonprevailing party" within that provision's scope. Reliant accordingly is liable for Calvary's attorneys' fees.

■■■ Sam similarly is bound by the lease's attorney-fee provision because "a litigant who sues based on a contract subjects him or herself to the contract's terms." *In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 755 (Tex. 2001) (orig. proceeding). Sam has done exactly that, and the reasoning in *FirstMerit Bank* applies here. In that case, the de los Santoses bought a mobile home for their daughter's family, the Alvarezes, and the seller assigned the installment contract to a bank, which repossessed the home. *See id.* at 752–53. The de los Santoses and Alvarezes sued the bank and the seller. *See id.* at 753. The Alvarezes tried to avoid an arbitration clause in the contract on the ground that they were not signatories, but the court rejected that argument because "the Alvarezes fully joined the de los Santoses' contract claims." *Id.* at 755–56.

The same is true here. Sam and Reliant pleaded alternatively that Reliant or Sam is Calvary's tenant under the lease. Sam and Reliant asserted identical claims, each of which was brought under the lease or related to one of the lease's general or special provisions. Like Reliant, Sam sought attorneys' fees under the lease's fee-shifting provision. Moreover, Sam and Reliant continued on appeal to request attorneys' fees as "prevailing parties" under the Lease without distinguishing between them.[16]

Under the lease, "Any person who is a prevailing party in any legal proceeding brought under or related to the transaction described in this lease is entitled to recover prejudgment interest, reasonable attorneys' fees, and all other costs of litigation from the nonprevailing party." By intervening in this case and asserting contract claims against Calvary under the lease, Sam made himself a "party in [a] legal proceeding brought under or related to the transaction described" in the lease.

Under Texas Rule of Appellate Procedure 43.3, appellate courts must render the judgment that the trial court should have rendered unless remand is necessary for further proceedings or in the interest of

---

16. *See* Appellants' Reply Brief, at 16 ("The Appellants ... were contractually entitled to recover attorney's fees under paragraph 30 of the original lease agreement."); Cross-Appellees' Response Brief, at 24 ("As the prevailing parties, the Trust and Samuel Range were the only parties entitled to an award of their attorney's fees."); *id.* at 27 ("As the 'prevailing parties,' the Trust and/or Samuel Range are entitled to recover their attorney's fees under ... paragraph 30 of the Lease Agreement.").

justice. Although questions regarding attorneys' fees commonly are remanded, they usually are remanded on grounds such as the following:

- The finding on the amount of attorneys' fees was predicated on liability or at least on the results obtained, so that if the case is reversed on appeal or the damages modified, there is no finding of attorneys' fees for the now-prevailing party or in view of the modified results. Here, however, the parties agreed to submit attorneys' fees to the jury without a liability predicate, and because Sam and Reliant together received only 0.6% of the amount they sought—and because the jury assessed identical attorneys' fees for each side—we can be "reasonably certain that the jury was not significantly influenced by the erroneous amount of damages it considered." *Barker v. Eckman*, 213 S.W.3d 306, 313–14 (Tex. 2006).

- The evidence is legally and factually insufficient to support the full amount assessed, unless we are able to suggest remittitur, and the prevailing party accepts it. Here, the evidence is legally insufficient to support the full amount of Calvary's trial attorneys' fees, but Calvary has stated that it prefers remittitur rather than retrying attorneys' fees.

- The fee award is discretionary with the trial court and the appeal has resulted in a different judgment, such as in declaratory-judgment

cases. But here, the contract makes the fee-award mandatory.

- The appellate court sustains a complaint of failure to segregate. Calvary preserved such a complaint regarding Sam's and Reliant's attorneys' fees, but because they are nonprevailing parties, their fees are no longer at issue.

In the examples above, further proceedings would be necessary because the appellate court's reversal or modification of the judgment would leave an outstanding question of fact or would require the trial court to reconsider the extent to which a discretionary fee award is warranted. When further proceedings are not necessary, however, we have rendered judgment addressing attorneys' fees.[17] Here, there are no issues on which the trial court must exercise its discretion, and provided that Calvary accepts our suggestion of remittitur (as it has represented that it will), there are no outstanding questions of fact.

In sum, Sam and Reliant brought identical causes of action, based on the same factual allegations, and they both claimed the benefit of the fee-shifting provision as "prevailing parties." Having consistently maintained their right to the benefit of that provision when they believed themselves to be the prevailing parties, neither Sam nor Reliant can avoid that provision now that they have been determined to be nonprevailing parties.

---

17. For example, in *Mitchell v. LaFlamme*, 60 S.W.3d 123, 126 (Tex. App.—Houston [14th Dist.] 2000, no pet.), we reversed the trial court's denial of attorneys' fees and rendered judgment for attorneys' fees in the amount assessed by the jury. In *Lee v. Lee*, Susan Lee successfully obtained her brother Ronald's removal as the trustee of the family trust, and the trial court ordered the trust to pay both sides' attorneys' fees. *Lee v. Lee*, 47 S.W.3d 767 (Tex. App.—Houston [14th Dist.] 2001, pet. denied). We reversed and rendered in part, ordering Ronald to reimburse the trust for Susan's trial attorneys' fees. In a motion for rehearing, Susan asked us to additionally address appellate attorneys' fees, and we held that Ronald had to reimburse the trust for the stipulated amount of those fees as well. *See id.* at 797.

We overrule Sam's and Reliant's sixth issue, grant in part their motion for rehearing, sustain in part Calvary's second cross-issue, and grant in part Calvary's alternative cross-motion for rehearing.

## VII. CONCLUSION

We conclude that Sam and Reliant did not prove by conclusive evidence or as a matter of law that (a) Calvary intended to bind itself to sell the property to either or both of them on the terms stated in Brocato's March 29, 2012 email; (b) the email modified the lease; or (c) Calvary breached the lease. We accordingly affirm the portion of the judgment containing declarations in Calvary's favor, and we conclude that Sam's and Reliant's alternative requests for specific performance of the alleged agreement or for damages resulting from its alleged breach are moot.

On the other hand, there is no evidence that Sam or Reliant sustained recoverable damages in reliance on Calvary's alleged promise to sell the property, and thus, we modify the judgment to order that Sam and Reliant take nothing by their promissory-estoppel claims.

Because the trial court properly could fail to find that Sam Range, Connie Range, Martha Range, and the Martha Range Trust are current clients of Weycer Kaplan, and because there is no evidence that Weycer Kaplan formerly represented Reliant or an affiliated person or entity in this matter or in a substantially related matter, we conclude that the trial court did not abuse its discretion in denying Reliant's motion to disqualify the law firm from representing Calvary.

As a result of our disposition of these issues, we hold that, for the purpose of the attorney-fee provision of the lease, Calvary is the prevailing party and Reliant and Sam are the nonprevailing parties. We therefore reverse the portion of the judg-

ment addressing attorneys' fees. We conclude, however, that although the jury assessed Calvary's reasonable and necessary trial attorneys' fees at $232,000, there is no evidence that Calvary's reasonable and necessary attorneys' fees for representation through trial exceeded $164,714.97. We therefore suggest remittitur of $67,285.03 from the amount assessed by the jury for Calvary's trial attorneys' fees. If, within fifteen days of the issuance of this opinion, Calvary files in this court its acceptance of our suggestion of remittitur, we will modify the judgment to include declarations that Calvary is the "prevailing party" and that Sam and Reliant are the nonprevailing parties as those terms are used in the attorney-fee provision of the lease. Subject to Calvary's acceptance of remittitur, we further modify the judgment to hold Sam and Reliant jointly and severally liable to Calvary for attorneys' fees of $164,714.97 for representation through trial and $30,000 for representation through appeal to the intermediate court of appeals; and that in the event of an unsuccessful further appeal to the Supreme Court of Texas, Sam and Reliant shall be jointly and severally liable to Calvary for $15,000 for representation at the petition-for-review stage; $25,000 for representation at the merits-briefing stage; and $10,000 for representation through oral argument and completion of proceedings in the Supreme Court of Texas. If, however, Calvary does not accept our suggestion of remittitur, we will remand to the trial court the issues of the amount of, and liability for, Calvary's attorneys' fees. *See* TEX. R. APP. P. 44.1(b).

Thus, subject to Calvary's acceptance of our suggestion of remittitur, we affirm the judgment as modified.